PEOPLE, *for use of* ALPHA PORTLAND CEMENT CO., *v.* BOYES & BLANDFORD CO.

1. PRINCIPAL AND SURETY—STATUTORY BOND—SURETY LIABLE ONLY FOR MATERIAL USED ON CONTRACT JOB.

In an action by a cement company against a contractor for the construction of a public highway and its surety on the statutory bond, given in pursuance of Act No. 187, Pub. Acts 1905 (3 Comp. Laws 1915, § 14827 *et seq.*), where it appeared that a large quantity of cement furnished by plaintiff for use in constructing said road was not so used by the contractor, the trial court properly *held,* that defendant surety company was liable only for such cement as was actually used in the construction of

said highway; the protection under said bond being analogous to that under the general lien laws.

2. SAME—FRAUD—SALES.

A suggestion by plaintiff to the contractor that it order for immediate shipment "all the cement you would like to use this fall," before a governmental order took effect limiting shipment of cement, which suggestion was acted upon and more cement ordered than the contractor could use, resulting in a large loss from deterioration, *held*, not unlawful or fraudulent so as to defeat plaintiff's right to recover from the contractor for the cement so shipped, and from the surety for the cement actually used.

3. SALES—DEFECTIVE MATERIAL—NOTICE OF DEFECT—ACCEPTANCE —LIABILITY OF BUYER.

Although one car load of cement was condemned by the State as not up to standard in tensile strength, where plaintiff was not notified of that fact and given an opportunity to replace it, and it was mixed in with the other cement and used by the contractor, it will be presumed to have affirmed a previous acceptance and is liable for the purchase price thereof.

Error to Kent; Brown (William B.), J. Submitted June 9, 1922. (Docket No. 65.) Decided March 22, 1923.

Assumpsit by the people of the State of Michigan, for the use and benefit of the Alpha Portland Cement Company, individually and as assignee of the Burt Portland Cement Company, against Boyes & Blandford Company and the New Amsterdam Casualty Company for materials furnished on road contracts. Judgment for plaintiff against Boyes & Blandford Company for an insufficient amount. Plaintiff brings error. Reversed and remanded.

*Francis L. Williams*, for appellant.

*Travis, Merrick, Warner & Johnson*, for appellees.

STEERE, J. On August 2, 1918, defendant Boyes &

Blandford Company entered into contracts with the State highway commissioner under the so-called Covert act to do certain highway construction on the "Huron Shore Pike Job" in Sanilac county, technically known as assessment districts 150, 151, 152 and 158.

There was a separate contract entered into for each of the four districts with a bond as the law required for its faithful performance, approved by the State highway commissioner, furnished and executed by defendant New Amsterdam Casualty Company. The condition of each bond is as follows:

"The condition of this obligation is such that if there shall be paid, as the same may become due and payable all indebtedness which may arise from said contractor to a subcontractor or party performing labor or furnishing materials, or from any subcontractor to any person, firm or corporation on account of any labor performed or materials furnished in the erection, repairing, or ornamentation of such building, improvement or works, then this obligation to be void, otherwise to remain in full force and virtue."

On August 14, 1919, the Burt Portland Cement Company entered into a contract with the Boyes & Blandford Company to furnish the latter 7,000 barrels of cement to be used in construction of culverts on those Huron Shore Pike sections at a price of $2.55 per standard barrel, including package, "f. o. b. cars, freight allowed to destination based upon the present tariff applying from Bellevue, Michigan." The cement was to be packed in cloth sacks for which 10 cents each would be allowed for all returned within 90 days in good condition, and 5 cents per barrel discount allowed "for cash in full monthly, upon receipt of monthly estimates from State." Four places of delivery, Amadore, Croswell, Applegate and Carsonville, convenient to the sections of highway to be constructed, are specified. Times of delivery are stated: "As per contractors' requirements until completion of

work—State says 'must complete work December 1, 1919.' " Specifications for cement under the contract are that it "is to conform to standard specifications for Portland cement adopted September 1, 1916, by the American Society for Testing Materials."

On August 30, 1918, the Burt Portland Cement Company wrote the Boyes & Blandford Company, stating "Instructions have just reached us from Washington that 'No manufacturer will furnish any road building material until the project has been approved by the United States Highway Council:'" that it included bridges and culverts, and the approval must come through the State highway commissioner; that the order forbidding shipments except upon approved work became effective September 10, 1918, and the State highway commissioner had advised it "would be best for all concerned that you have delivered immediately—or before September 10th—and stored at different points along your line all the cement you would like to use this fall and we urge you to take this matter under advisement," saying that if the plan outlined was decided upon "do not delay placing your orders a day longer than necessary." On September 3d Boyes & Blandford Company responded by wiring "Ship immediately with expectation of completing before September 10th." Four thousand, six hundred and four barrels of cement were delivered along the main line at convenient points between the 1st and 9th of September, 1918.

The work was delayed because of labor scarcity, difficulties in getting gravel and other impediments resulting from existing war conditions, and extensions of time were granted by the State highway department, but Boyes & Blandford Company had become financially embarrassed to the extent that on January 6, 1919, it entered into an agreement with the Burt Portland Cement Company and all but one or two

other of its creditors by which they consented to defer payment of debts then owing them for a year, also consenting to Boyes & Blandford Company consummating a loan from Philip Fritz of Grand Rapids for the purpose of continuing and completing its "Sanilac and Le Roy jobs," and appointing Fritz "trustee for creditors to receive, handle and disburse the funds coming into his hands as such trustee for the purpose and in the manner herein stated," the general scope of his trusteeship being "to supervise the finances of said debtor in the interests of all creditors." Paragraph 4 of said agreement provides:

"That said trustee shall apply the money obtained from the before-mentioned loan or loans, together with all moneys received on estimates from the State of Michigan under the contracts with said State covering the said Sanilac and Le Roy jobs, first, to the payment of all valid and accrued debts incurred in prosecuting the work on the said jobs. Provided, that persons furnishing materials on said jobs shall be paid for such materials only as estimates are received from the State, and then for such of said materials as are covered by said estimates."

The Boyes & Blandford Company continued performance of their contracts under extensions of time, but on November 1, 1919, the State highway authorities ordered it to discontinue all use of Burt Portland cement. In October, 1918, the State highway commissioner notified Boyes & Blandford Company that one car load shipped to Carsonville in September, 1918, had failed to meet the test for standard requirements as to tensile strength, and after May 5, 1919, the State ordered the contractor to screen all Burt cement in which process about one-third of it was screened out and thrown away.

Plaintiff Alpha Portland Cement Company, a New Jersey corporation, became owner of this claim as assignee of the Burt Portland Cement Company after

action was begun, following which pleadings were amended by consent of counsel and this case tried before the court without a jury. Findings of fact and conclusions of law were filed by the court, resulting in a judgment in favor of plaintiff against the Boyes & Blandford Company for $4,016.82, and of no cause of action in favor of the New Amsterdam Casualty Company. From such adjudication plaintiff brings the case here for review by writ of error alleging 75 different errors committed by the trial court. The direct controversy in this court lies between plaintiff and the New Amsterdam Casualty Company, although plaintiff's counsel discusses at length the liability of Boyes & Blandford Company separately, "to clarify the issue as to the bonding company."

The trial court held as a conclusion of law that under the terms of its bond the casualty company was only liable for the amount of cement which was actually used in and became a permanent part of the highway construction accepted by the State and that it could not be held accountable for "any cement sold from jobs or which still remained on the jobs, or which was screened out and thrown away pursuant to order of the State highway department."

The court also found "as a matter of law that the fraud of plaintiff's assignor (the Burt Portland Cement Company) in attempting to defeat the war order of the United States government is a further reason why it cannot recover against the New Amsterdam Casualty Company." Part of the court's findings upon that proposition are as follows:

"That between September 1st and September 8, 1918, as a result of this conspiracy and plan there was placed on these jobs 22 car loads of cement, being 18,416 sacks or 4,604 barrels, all of the parties thereto knowing the lack or inadequacy of storage facilities on said jobs, the nature of the materials in question, and the

time in which it would deteriorate, and the impossibility of its being used before winter set in. The defendant bonding company was not a party to and had no knowledge of this action. As a result of it, however, a large quantity of said cement became unfit for use and about May 1, 1919, the State highway department required all Burt Portland cement to be screened by the contractor, and about November 1, 1919, ordered its use to be stopped because it was in a large measure spoiled. A large portion of said cement was, as a result of this fraudulent plan and scheme, wasted. * * *

"I further find that the actions of plaintiff's assignor, the State highway department and the defendant, Boyes & Blandford Company, in entering into a conspiracy and unlawful understanding to place upon this job 22 car loads of cement, not as contemplated by the contract, but all at one time and to ship this cement just prior to the time when the Federal war order creating the Federal highway commission went into effect, was done for the purpose of making delivery of said 22 car loads of cement without the consent of the United States government in time of war."

The record fairly supports the court's finding of facts as to a combined activity of the named parties to rush delivery of sufficient cement for those contracts before the Federal order, made effective September 10, 1918, took effect, and the consequences of their haste which resulted in this litigation; but the United States is not complaining or a party to this action, nor are we referred to any authority sustaining the proposition that shipping and delivering this cement to the contractor before the Federal order went into effect was unlawful or fraudulent, though evidently ill-advised as the court points out. The only injurious results disclosed were to the alleged conspirators themselves.

Aside from that question, however, the trial court was right in the conclusion that the defendant bonding company could not, under the condition of its

bonds, be held liable for any cement not actually used in constructing this highway. These bonds were given under and with express reference to the requirements of Act No. 187, Pub. Acts 1905 (3 Comp. Laws 1915, § 14827 *et seq.*). Said act is entitled:

"An act to insure the payment of subcontractors and wages earned and material used in constructing, repairing and ornamenting public buildings and public works."

Section 1 of the act requires "sufficient surety by bond for payment for all labor performed and materials furnished in the erection, repairing or ornamenting of such building or works."

The contracts were with the State highway commissioner under the Covert act and subject to his supervision, with an approved statutory bond presumably in an amount based on the size of the contract with a view to cover the labor done and material used in constructing the highways. The act provides the manner of making payments to contractors by the State. Both the contract for this cement and the creditors' agreement contemplate payments based on State estimates which only recognize accepted work done and material used in the construction. On November 2, 1918, the Portland company's sales manager wrote urging Boyes & Blandford Company to "see that the work is vigorously prosecuted that we may both secure the money which will then be available." He testified that when he wrote this letter he knew "the money was to be received when the estimates were made by the State and the money paid by the State." But even if the contracting parties had no understanding that the contractors' bond did not cover unused or rejected material furnished for the work, previous decisions of this court are contrary to plaintiff's construction of our statute. Protection under the statutory bond is analogous to that under

our general lien laws.    In *People* v. *Sheehan,* 118
Mich. 539, plaintiff brought action against a paving
contractor and sureties on his bond for purchase price
of some rejected curb-stones furnished for use in pav-
ing a street of Detroit.    This court there said:

"We are of opinion that the bondsmen cannot be
held liable for material which, though purchased for
this job on Randolph street, was rejected and sold to
other parties."

It is true the authorities in other jurisdictions are
not in entire harmony upon that subject, and in some
States under the wording of their statutes it has been
held that the surety is liable for material bought and
furnished in good faith for use in the work contracted
for although it was rejected or otherwise disposed of
by the contractor and did not become a part of the
construction, apparently on the theory that the con-
tractor became an agent of the surety for the purpose
of contracting such liability.    This court has taken
the view that to so extend the statutory protection—

"would tend to impair, if not absolutely destroy, the
value of the bond to those who, in fact, did perform
labor or furnish materials 'in the erection, repairing
or ornamenting of such building, works or improve-
ments.'"    *City of Alpena* v. *Surety Co.,* 159 Mich.
329.

The court was then construing an act of like im-
port and superseded by Act No. 187, *supra,* the
wording so far as material here being the same.    It
is also said of the legislative intent:

"We are of opinion that by the statute in question
the legislature intended to afford to those who furnish
labor or material for public buildings or works the
same protection they would have under the general
lien laws of the State, had the labor or materials been
furnished for a private undertaking.    If we are
correct in this view, we are left in no doubt as to the
construction the statute should receive.    In *Smalley*
v. *Gearing,* 121 Mich. 190, 203, this court said:

" 'The equity of a lien claim for labor or materials arises from the fact that the value of the property to which they have been applied has been increased.'

"This case was cited and approved in *North* v. *Fence Co.*, 144 Mich. 557.   See, also, *Luttrell & Co.* v. *Railroad Co.*, 119 Tenn. 492 (105 S. W. 565) ; *McCormick* v. *Water Co.*, 40 Cal. 185."

Counsel for plaintiff particularly stresses and quotes from *Western Hardware & Metal Co.* v. *Casualty Co.*, 105 Wash. 54 (177 Pac. 703, 181 Pac. 700).   The lien law of that State makes the contractor agent of the owner for the purpose of establishing a lien, and their bonding statute imposes protection of material men and all others who furnish the contractor "with provisions and supplies for the carrying on of such work."   That opinion recognizes the apparent lack of harmony in different jurisdictions with the suggestion that it is more apparent than real owing to difference in language of different statutes, and says:

"Of course, where a statute by its terms gives a lien right only for material actually going into and becoming a part of the structure, as some of them do, such a condition is necessary to support a claim of lien thereunder; but such are not the terms of our lien or bond statute."

In *United States* v. *Jack*, 124 Mich. 210, cited for plaintiff, the court was dealing with the Federal statute which is quite different in its provision from that of this State and protects all persons supplying the contractor with "labor and materials in the prosecution of work provided for in such contracts," language which in the connection used the court said "could not well be more comprehensive."   This cannot be said of the Michigan act.

The bonding company being held only liable for cement which was accepted, used in and became a part of the highway improvement, it is further urged for

plaintiff that the court's finding of fact that all so used was paid for is not supported by the evidence. It appears undisputed that on September 4, 1918, the next day after sending its message to the Portland Cement Company to start shipments immediately, Boyes & Blandford Company wrote the State highway department authorizing it to pay the cement company "for cement when shipped for Huron Shore Pike at $2.56 per bbl., delivered, and charge to our contract," and on October 7, 1918, wrote the State highway commissioner in part as follows:

"Inclosed we hand you O. K. invoices of the Burt Portland Cement Co. covering shipment of cement for our work on Huron Shore Pike. (Stating places where delivered, amounts received at $2.56, etc.)

"Amount due Burt Portland Cement Co. $11,746.84. 12½ bbls. deducted for damaged cement. See Fgt receipt with notation of damage attached to invoice.

"Kindly return invoices for our files when you are through with them."

Plaintiff's evidence showed that in connection with the arrangement for hurried shipment before the Federal order went into effect it was understood the State department would pay the Burt Portland Cement Company for the cement when shipped, on Boyes & Blandford Company's orders, and charge the advancement to the latter's contract. This could not be legally done and payments were only made on estimates as the work progressed. The State estimates so made gave no separate estimate or statement of the cement used, but showed the cubic yards of concrete accepted and the amount each of two different mixes of concrete, the formula for which, 1-2-4 and 1-3-6, according to the testimony, required 1.61 bbls. of cement in each cubic yard of 1-2-4 concrete, and 1.05 bbls. in a cubic yard of 1-3-6 concrete. Applying this formula the court found:

"The amount of cement actually used in the con-

struction of these various jobs figured from the esti-mates and taking into consideration the different mixes is 3,085.69 barrels, which at $2.55 a barrel amounts to $7,868.51."

A war tax amounting to approximately one cent per barrel on these shipments was imposed by the Federal government, which was included in the invoice price O.K.'d by Boyes & Blandford Company as a proper charge under their contract, which allowed freight to destination based on the then tariff applying from Bellevue.

Approaching the subject by elimination of cement not used in the work from the total amount delivered at the job, the court found that of the cement required to be screened after May 2, 1919, "it was necessary to throw away about one-third of it" because there were lumps in the cement and the part which was thrown away was of no value and useless, but did not find how much was screened. It appears, how-ever, that the witness who furnished the testimony on which this finding is based also estimated the quantity screened out and thrown away as "more than 175 barrels." The court also found with sustaining proof that Boyes & Blandford Company sold 600 barrels of the rejected cement for $1.50 per barrel because of its condition, that 175 barrels more were sold to the Schlinkert Building, Fuel & Supply Company for $144.46 by plaintiff's assignor, who retained the money, and about 121.5 barrels, in sacks and worth-less, were left on the job. The finding of facts con-cludes as follows:

"State estimates show that 3,085.69 barrels of cement were in the work. Of this cement 2,142.74 barrels were paid for, leaving 943.95 barrels not paid for but used in the work. Adding 943.95 barrels and 121.5 barrels we have 1,065.45 barrels of cement not paid for and for which defendant, Boyes & Blandford Company, is liable at $2.55 per barrel, being $2,726.90.

Defendant Boyes & Blandford Company, is also liable to plaintiff for 600 barrels at $1.50 per barrel, being $900."

The court's conclusions of law end as follows:

"I find that plaintiff is entitled to recover from the Boyes & Blandford Company the sum of $3,626.90 together with interest at 5 per cent. from the 1st day of December, 1919."

The judgment entered thereon in favor of plaintiff against Boyes & Blandford Company is, as before noted, "in the sum of $4,016.82," with costs.

To the court's original findings and conclusions, which as such are set out in the record at length, counsel for plaintiff proposed as amendments 75 findings of fact, and 25 conclusions of law asked to be substituted "in lieu of the entire conclusions of law found by the court." A short order of the court grants some and refuses others by number, concluding:

"It is further ordered that the findings filed by this court on October 29, 1921, and the foregoing proposed amendments to the findings of fact and conclusions of law which have been allowed or refused as above indicated, are the court's completed findings of fact and law."

Search and comparison of the rather voluminous "court's completed findings of fact and law" as above indicated, with amendments and substitutions allowed by number only, discloses some inconsistencies and uncertainty as to the mathematics and theories by which the judgment rendered was arrived at. The theory of conspiracy and fraud might, if tenable, justify the judgment in favor of the bonding company, but that reason was only given in the court's conclusions of law as "a further reason" why plaintiff could not recover against it, after holding the bonding company only liable for such cement as was

actually used as a part of the finished work and that plaintiff had been paid in full for all cement actually so used.

Yet the court found with sustaining proof that 3,085.69 barrels of cement were so used in the work, which at $2.56 per bbl. would amount to $7,899.36, and that it was conceded plaintiff had been paid $5,628.82, which leaves a debit balance of $2,270.54 in its favor yet unpaid. The record well supports the finding of facts which gives that result, and plaintiff should have judgment against the bonding company for $2,270.54 with interest at 5 per cent. from December 1, 1919.

Plaintiff also urges that the judgment against Boyes & Blandford Company should be for the agreed purchase price of the 4,604 barrels delivered, less total credits, and argues the deductions made by the court are unsupported in fact and law. No brief has been filed by Boyes & Blandford Company except as counsel for the bonding company contend against the judgment and its size, primarily in their client's defense. In that connection the sweeping contention is made that in any event plaintiff cannot, under the provisions of its contract of sale and the creditors' agreement, compel payment beyond estimates and payments by the State to the contractor of which 20 per cent. is withheld by the State until final estimate is made, and none had been made when this action was begun.

The judgment rendered shows that theory was not entertained by the trial court. Neither is it tenable under the facts shown. The quantity of cement delivered between September 2d and 10, 1918, was shipped under special agreement for prompt payment supplemental to the original contract of purchase. Boyes & Blandford Company's treasurer and secretary testified to an arrangement between the parties whereby

the State would pay for that cement as it was shipped and charge it to the contract of Boyes & Blandford Company when it was accepted by the latter, there being two reasons for ordering it shipped at that time, saying in part:

"One was due to the railroad conditions that were tightening up at that time, and the possibility of not being able to get the material on the job, and the other was that we planned that this work would be completed in reasonable time, and would for that reason have the entire amount shipped to the job, and this was the substance of the conversation between myself and Mr. Boyes regarding this cement at that time. * * *

"Q. Then you have told us about some sort of an arrangement you had with Mr. Burt about the payment of this money by the highway department.

"A. Yes.

"Q. To be paid all forthwith upon shipment?

"A. That was the agreement. * * * The agreement was to pay the money forthwith on shipment. The only thing I had done was to notify the State department, or make an order on the State department to the Burt Portland Cement Company in accordance with that agreement."

The creditor's agreement as to payments on estimates, whatever its validity or application before, could scarcely operate on this performed contract of sale and purchase after November, 1919, when use of Burt cement was stopped and the rights of these parties, whatever they were, permanently fixed. By that contract, delivery was to be made according to requirements of the purchaser, on its shipping orders in writing, by giving the seller instructions and reasonable time before shipments were to be made.

Time of shipping, as well as quantity, within limits of the contract, were subject to the purchaser's orders. The cement in controversy was shipped in compliance with Boyes & Blandford Company's order of September

3, 1918, instructing the cement company to start shipping immediately with a view of completing the order before the · 10th of that month, and to be sure it "passed strict test." C. H. Denman, a chemist of 20 years' experience, largely with cement, who was in charge of the Burt Portland Cement Company's chemical department at that time, produced and verified a copy of the records made in the fall of 1918 when analyzing and testing this cement. He testified that of his own knowledge the tests and records then made were "true and correct and that they conform to the standard specifications for Portland cement adopted September 1, 1916, by the American Society for Testing Materials."

When the Burt Portland Cement Company delivered this cement on Boyes & Blandford Company's written order at the time and place directed, of a quality complying with the tests specified in the contract, it had fully performed on its part as to such shipments. It thereafter had no control over the time when it should be used or where it was stored. Its suggestion to Boyes & Blandford Company for increased immediate delivery orders in view of the Federal orders was for "all the cement you would like to use this fall." No complaint was made to the cement company that any of this cement was not up to the standard test specified in the contract until this action was begun two years later, and then only as to one car load designated by letters and No. 13980, shipped to Carsonville, September 13, 1918, which the State highway commissioner wrote Boyes & Blandford Company, on October 14, 1918, failed to meet the test as to tensile strength. Neither the State or contractor notified the Burt Portland Cement Company of that fact, so they could withdraw the car and replace it, and no attention was even paid to the notice from the State by the contractor. Boyes himself testified:

"We did not make any attempt to keep these cars separate in unloading them. * * * The cars were not kept separate in unloading. The cement from that car was mixed with the other cement."

Defendant's hearsay proof that this car failed in tensile strength was the copy of a test made by the Perry Testing Laboratory in Detroit sent to the State highway engineer, who did not see the test made, and which was admitted in evidence against objection, unverified by the testimony of any witness who was present, or knew that the claimed test was correctly made. Even the original record would seem to require supporting evidence. *Swan* v. *Thurman,* 112 Mich. 416.

But if it was below the standard of strength it was the duty of Boyes & Blandford Company to so advise the cement company within a reasonable time if they desired to escape payment for it. *Columbus, etc., Iron Co.* v. *See,* 169 Mich. 663; *Pentland* v. *Jacobson,* 189 Mich. 339. This they did not do. They apparently paid no attention to the notice of the State highway commissioner, retained and used the car load the same as the rest without complaint or notice to the cement company for over two years after being advised by the State, and not until sued for its value. With such a lapse of time they must be deemed to have affirmed its previous acceptance on October 7, 1918, when they O.K.'d the invoices showing "Amount due Burt Portland Cement Company, $11,746.84." Excepting this car load, the trial court found in an allowed amendment to the original findings, "That the cement furnished in the job was all furnished in accordance with the contract."

From tangible figures in the findings sustained by the evidence we conclude plaintiff should have judgment against Boyes & Blandford Company to the amount of $6,118.02 with interest at 5 per cent. from

December 1, 1919, less the joint judgment against both defendants for the amount the bonding company is holden for.

The case will be remanded with instructions to modify the judgment heretofore entered in accordance with this opinion. Plaintiff will take costs in this court.

WIEST, C. J., and FELLOWS, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.